UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| TERICK AZEEZ,<br><br>　　Plaintiff,<br><br>　　v.<br><br>LIFESPAN CORPORATION,<br><br>　　Defendant. | C.A. No. 1:21-CV-00055-MSM-LDA |

**MEMORANDUM AND ORDER**

Mary S. McElroy, United States District Judge.

　　The plaintiff, Terick Azeez, has filed this action claiming that he was fired by the defendant, Lifespan Corporation ("Lifespan"), in retaliation for complaining about racial discrimination in violation of Title VII, 42 U.S.C. § 2000E *et seq.*, the Rhode Island Fair Employment Practices Act ("FEPA"), R.I. Gen. Laws § 28-5-1, and the Rhode Island Whistleblowers' Protection Act, R.I. Gen. Laws § 28-50-1; and that Lifespan violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681b(b)(3)(A), by relying on negative information in his background check to terminate him without first notifying him of the information and providing him an opportunity to respond. Mr. Azeez also brought hostile work environment claims, but he has conceded summary judgment on these counts. (ECF No. 22 at 8, f.1.) The Court now considers Lifespan's Motion for Summary Judgment (ECF No. 16) on the remainder of Mr. Azeez's complaint.

1

For the reasons below, Lifespan's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

## I.  BACKGROUND

In May 2019, Mr. Azeez was hired for a per diem position in the Lifespan Clinical Research Center ("LCRC"). (ECF No. 17 ¶ 20.) Before beginning his employment, Mr. Azeez submitted to a background check, per Lifespan company policy. Lifespan's background check vendor, ADP, provided Lifespan's Talent Acquisition team with a background report on Mr. Azeez, showing that during college he pled guilty to two drug-related offenses. (ECF No. 24 ¶ 8.) Mr. Azeez has not had any further contact with the criminal justice system since those convictions. (ECF No. 22 at 3.) Lifespan received this report on or about May 24, 2019. (ECF No. 17 ¶ 22.) Mr. Azeez was allowed to begin employment at the LCRC on June 3, 2019. (ECF No. 17 ¶ 5.)

His employment did not proceed completely smoothly, with Mr. Azeez receiving at least one verbal warning from his supervisor, Evelyn Hipolito, in February 2020, for failing to complete certain time-and-effort reports that accompanied his work. (ECF No. 22 at 4.) His performance was, however, sufficient for him to receive a position upgrade in May 2020, when he was hired as a full-time, salaried Research Assistant. *Id.* at 5.

Soon after, in response to nationwide protests inspired by the murder of George Floyd, Rhode Island Hospital hosted a vigil for its employees. *Id.* Mr. Azeez attended this event and spoke about experiences with racism that he and other employees of

color had experienced while working at Lifespan.  *Id.*  In response, Lifespan formed an Anti-Racism Committee, which Mr. Azeez applied to join.  *Id.*  On July 24, 2020, Mr. Azeez received an email from David Goldman, Program Manager for Inclusion, Diversity, Equity, HR Compliance, advising him of his selection to the Committee and the need to obtain approval for his participation from his supervisor.  *Id.* at 6.  Ms. Hipolito denied this request for approval, citing concerns with Mr. Azeez's performance.  (ECF No. 17 ¶ 54.)

In response, Mr. Azeez reached out to Mr. Goldman.  The two discussed Mr. Azeez's perception of racial microaggressions he believed he had experienced from Ms. Hipolito, and Mr. Azeez articulated a concern that Ms. Hipolito's refusal to allow him to join the Committee was due to racial discrimination.  (ECF No. 22 at 6.)  On July 30, 2020, Mr. Azeez called Mr. Goldman again to let him know he wanted to file a formal HR Complaint about this alleged discrimination.  Mr. Goldman reported this to Timothy Shayer, the HR Business Partner for the LCRC.  (ECF No. 17 ¶ 55.)  Mr. Shayer spoke to Mr. Azeez and told him that he did not believe this was a case of racial discrimination.  (ECF No. 24 ¶ 87.)  Mr. Azeez eventually was given permission to serve on the Anti-Racism Committee, after senior staff at Lifespan intervened in support of his participation.  (ECF No. 22 at 7.)

On August 12, 2020, an anonymous report was made to Lifespan's Corporate Compliance hotline revealing that Mr. Azeez had a criminal record.  (ECF No. 17 ¶ 64.)  The next day, Mr. Shayer contacted David Sinapi, Lifespan's Director of Talent Acquisition, to verify that a background check on Mr. Azeez had been done.  *Id.* ¶ 66.

After reviewing the background check, which included the two drug convictions, Mr. Shayer concluded that, "since he has disqualifying information and shouldn't have passed his onboard, this will be the reason for termination." (ECF No. 24 ¶ 113.) Mr. Shayer also discussed with Mr. Sinapi the need to send Mr. Azeez a pre-adverse letter notifying him of this information, but they decided not to send the notice. (ECF No. 22 at 8.) On August 17, 2020, Mr. Azeez was summoned to a meeting at which Mr. Shayer informed him that he was being terminated because of negative information on his background report. *Id.*

Mr. Azeez brought this action against Lifespan, claiming that he was terminated for speaking out about racial discrimination in violation of Title VII, FEPA, and the Rhode Island Whistleblowers' Protection Act. He also claims that Lifespan violated the FCRA by firing him without providing him the statutorily required pre-adverse-action notice. In response, Lifespan has moved for summary judgment. Lifespan argues that the termination was unrelated to his complaint of racial discrimination and was simply a matter of following their clear internal policies against hiring anyone with a drug conviction. Lifespan also claims that Mr. Azeez did not suffer an actual injury from any alleged FCRA violation, arguing that the purpose of the FCRA's pre-adverse-action notice requirement is to allow the employee to correct any inaccurate information. Since the information on Mr. Azeez's background check was accurate, Lifespan alleges that he suffered no concrete injury-in-fact from his lack of pre-adverse-action notice.

4

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment's role in civil litigation is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Garside v. Osco Drug. Inc.,* 895 F.2d 46, 50 (1st Cir. 1990). Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir. 2000). When determining whether to grant summary judgment, the record is reviewed in the light most favorable to the non-moving party, and all factual inferences must be drawn in their favor. *See Rossy v. Roche Products, Inc.,* 880 F.2d 621, 624 (1st Cir. 1989). This review should be "most searching in cases, such as this, that turn upon the issue of motive or intent…[as] these difficult questions are most suited for jury determinations, as proof is generally based on inferences that must be drawn." *Id.*  However, a party opposing summary judgment cannot rely on "conclusory allegations, improbable inferences, and unsupported speculation." *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 33 (1st Cir. 2001).

### III. DISCUSSION

### A. Plaintiff's Retaliatory Firing Claims

Mr. Azeez's claims that he was fired in retaliation for complaining of racial discrimination are subject to the *McDonnel Douglas* burden shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Santiago-Ramos*, 217 F.3d at 53. The first step in this analysis is the plaintiff's establishment of a prima facie case, which in retaliation claims requires a showing that: 1) the plaintiff engaged in protected conduct; 2) the plaintiff was thereafter subjected to an adverse employment action; and 3) there was a causal connection between the protected conduct and the adverse employment action. *Soto-Feliciano v. Villa Cofresí Hotels, Inc.*, 779 F.3d 19, 30 (1st Cir. 2015). Then, if the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate reason for the employment action. *Currier v. United Techs. Corp.*, 393 F.3d 246, 254 (1st Cir. 2004). Finally, in the third step, the plaintiff must provide evidence showing that the employer's proffered legitimate reason was a pretext and the real reason for the employment action was discriminatory or retaliatory. *Mesnick v. General Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991).

Here, no one disputes that Mr. Azeez can establish his prima facie case. (ECF No. 28 at 4.) Under Title VII and FEPA, protected conduct "refers to action taken to protest or oppose statutorily prohibited discrimination." *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009). Protected conduct includes "the filing of formal charges of discrimination" as well as "informal protests of discriminatory employment

6

practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Id.* Thus, Azeez's complaints that he was not allowed to serve on Lifespan's Anti-Racism Committee because of discrimination constitute protected conduct. He experienced an adverse employment action when he was terminated. At the prima facie stage temporal proximity between protected conduct and an adverse action is usually sufficient to establish causation, at least where the larger picture does not undercut any claim of causation. *Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003) (holding that evidence of chronological proximity demonstrated sufficient causality to establish prima facie case where the record does not undercut claim of causation). Mr. Azeez's termination came just over three weeks after the protected conduct. (ECF No. 22 at 12.) This temporal proximity is sufficient to demonstrate causation when establishing a prima facie case. *Calero-Cerezo v. U.S. Dept. of Justice*, 355 F.3d 6, 26 (1st Cir. 2004) (one month between protected conduct and adverse action sufficient to establish causation at the prima facie stage).

Lifespan has articulated as a legitimate reason for firing Mr. Azeez that the company has a policy disqualifying anyone with a drug conviction from employment. Lifespan claims that Mr. Azeez's initial hiring was an oversight, as the Talent Acquisition team member who oversaw his onboarding in May 2019 inadvertently failed to review the background check report at that time. (ECF No. 17 ¶ 29.) Lifespan argues that it appropriately terminated Mr. Azeez upon confirming that he

7

had disqualifying convictions on his record. (ECF No. 16-1 at 16-18.) The question, then, is whether Mr. Azeez has provided sufficient evidence to create a genuine dispute of material fact as to whether Lifespan's stated reason was pretextual and whether the real reason for the employment action was discriminatory or retaliatory.

Mr. Azeez argues that several dynamics, taken together, show that retaliation was the real reason for his firing. The first dynamic is temporal proximity. Temporal proximity alone cannot defeat summary judgment, but taken together with other factors may show causation. *Garayalde-Rijos v. Mun. of Carolina*, 747 F.3d 15, 25 (1st Cir. 2014) (temporal proximity "is merely one factor relevant to causation."). Mr. Azeez asserts that the timing of the anonymous report to Lifespan's Corporate Compliance hotline should also be viewed with some suspicion, coming as it did so soon after he made his complaint, when he had been working at Lifespan for more than a year. (ECF No. 1-2 ¶ 41.)

Further, Mr. Azeez argues that the retaliatory nature of his firing can be inferred from the fact that his complaint was on the minds of those who chose to fire him. Notes from an August 13, 2020, conversation between two of the people responsible for his termination indicate that they had discussed Mr. Azeez's racial discrimination complaint and its lack of grounding, with Mr. Shayer writing, "Evelyn – very effective, unfounded claims re Terick direct but fair not condescending punitive or negative." (ECF No. 24 ¶ 108.) Mr. Azeez argues that this reference to his racial discrimination complaint within a conversation about his future at Lifespan could

8

allow a reasonable jury to infer that anger over the complaint was the motivation behind his termination.

Finally, Mr. Azeez argues that Lifespan's stated reason for his termination is not worthy of credence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-48 (2000) ("[R]ejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination."). An inadequately explained deviation from an established personnel policy can demonstrate pretext. *Acevedo–Parrilla v. Novartis Ex–Lax, Inc.*, 696 F.3d 128, 142-43 (1st Cir. 2012) (deviation from a progressive discipline system accepted as evidence of pretext); *Vélez v. Thermo King De Puerto Rico, Inc.*, 585 F.3d 441, 450 (1st Cir. 2009) (reliance on a company policy that was ambiguous similarly accepted). On these grounds, Mr. Azeez asserts that there is a question of fact as to whether Lifespan adhered to its written policies regarding criminal background checks when it summarily terminated him upon learning of his past convictions. While Lifespan claims that his criminal history automatically disqualified him from employment, the written policy on this issue, HR Policy 1.18, calls for a more nuanced approach. This policy reads as follows:

> *Determinations Following Receipt of Negative Information*: Offers of employment are contingent upon Lifespan's satisfactory review of criminal background information. Determinations of suitability based on background checks will be made consistent with this policy and any applicable law or regulations. Exclusions from employment will be based on a conviction record (or a plea equivalent to a conviction) that is job related for the position in question and consistent with business necessity. If the result of the check(s) indicate that a criminal offense is present on an applicant or employee's record, Lifespan will make a decision on the person's candidacy or continued employment or

9

volunteer engagement. To make these determinations, Lifespan HR leadership will consider:

- The nature and gravity of the offense or conduct (i.e. the harm caused by the offense, statistics on recidivism, etc.);
- The time that has passed since the offense or conduct and/or completion of the sentence, with a minimum look back of at least seven (7) years from the date of the employment application;
- The applicant's employment history since the offense or conduct;
- The relevance of the crime to the nature of the job held or sought (identify essential functions, tasks and duties; level of supervision/oversight; interactions with co-workers, the public, patients or other vulnerable individuals. Consider the environment where the job is performed.
- Obligations to follow licensure regulations related to this issue.

*Opportunity to Refute*: If Lifespan is inclined to make an adverse decision based on the results of the background check, the individual will be notified. The individual will be provided with a copy of the criminal record and this Policy, advised of the parts of the record that make the individual unsuitable for the position, and given an opportunity to dispute the accuracy and relevance of the background record, to the extent permitted by law. If a candidate, current employee or volunteer challenges unsatisfactory information on a background check, he/she may work directly with the appropriate authorities to clear up the discrepancy but may not be employed or engaged by Lifespan until satisfactory results are obtained by a new background check.

Mr. Azeez argues that the fact that Lifespan went directly and immediately to termination, without considering the factors set forth for consideration or providing him the opportunities described in its written policy, creates a question of fact as to whether his criminal record was truly the reason for his firing.

In response, Lifespan argues that Mr. Azeez's interpretation of the above policy "is divorced from context and does not reflect how Lifespan actually operates." (ECF No. 16-1 at 30.) Given the number of hires and background checks Lifespan's HR department oversees, it has adopted a Background Check Adjudication Policy, which

includes a decision matrix that unambiguously indicates that when a candidate "Does Not Meet Company Standards" the inquiry is at end. *Id.* at 4-5. Lifespan says that this matrix incorporates its HR Policy 1.18, because it does not designate all convictions as automatically disqualifying. But the matrix does designate drug convictions as automatically disqualifying, and so when Lifespan learned of Mr. Azeez's past drug convictions, it fired him for that reason.

There remains a genuine issue of material fact as to whether Lifespan's Background Check Adjudication Policy would have required the automatic termination of an employee with a record such as this one. Taken along with the temporal proximity of Mr. Azeez's complaint with both the anonymous hotline report and his firing, as well as indications that the complaint was on the minds of those who did the firing, a "most searching" review finds enough of a possibility of pretext to deny Lifespan judgment as a matter of law. *See Rossy*, 880 F.2d at 624.

### B. The Plaintiff's FCRA Claim

Mr. Azeez also brings a claim under § 1681b(b)(3)(A) of the FCRA, which requires that before taking any adverse employment action based on a consumer report, an employer must provide to the affected employee or applicant a copy of the consumer report and a notice of their rights under the FCRA. The provision states:

> [B]efore taking any adverse action based in whole or in part on [a consumer report used for employment purposes], the person intending to take such adverse action shall provide to the consumer to whom the report relates—(i) a copy of the report; and (ii) a description in writing of the rights of the consumer under this subchapter…

11

It is uncontested that Lifespan terminated Mr. Azeez without providing him a copy of his criminal history report and notice of his rights. (ECF No. 17 ¶ 70.) However, Lifespan argues that Mr. Azeez did not suffer any actual injury as a result of the alleged FCRA violation, claiming that the purpose of this FCRA provision is to allow for the correction of inaccurate information, and that in this case there was nothing to correct. Therefore, Lifespan reasons that receipt of pre-adverse-action notice would not have changed the outcome in this case, and Mr. Azeez has no concrete injury-in-fact under the FCRA.

The question of the need for actual injury from a failure to provide pre-adverse-action notice in order to achieve standing remains unresolved in this Circuit. While the Eighth and Ninth Circuits have said the absence of an actual injury deprives a consumer of standing in cases such as this one, the Third and Seventh Circuits have held the opposite. *Long v. Se. Pa. Transp. Auth.*, 903 F.3d 312, 319 (3d Cir. 2018) ("§ 1681b(b)(3) confers on the individual a right to receive, before adverse action is taken, a copy of his or her consumer report (regardless of its accuracy) and a notice of his or her rights. This right permits individuals to know beforehand when their consumer reports might be used against them, and creates the possibility for the consumer to respond to inaccurate or negative information."); *Robertson v. Allied Sols., LLC*, 902 F.3d 690, 696 (7th Cir. 2018) ("[A]n employer's disclosure obligations under [§ 1681b(b)(3)(A)] exist to serve interests beyond the problem of inaccurate reports."). Further, the majority of district court decisions align with the Third and Seventh Circuits' interpretation. The weight of legal analysis on this question seems to side

with an interpretation of § 1681b(b)(3)(A) that would afford Mr. Azeez standing on his FCRA claim whether or not the information contained in the report was accurate.

### 1. Standing Under the FCRA Generally

The Constitution restricts the exercise of judicial power to "Cases" and "Controversies." U.S. Const. art. III, §§ 1, 2. This restriction has inspired the doctrine of standing, which requires a plaintiff to demonstrate "a personal stake in the outcome of the controversy." *Baker v. Carr*, 369 U.S. 186, 204 (1962). Demonstrating an injury-in-fact is the "[f]irst and foremost" element a plaintiff must show to satisfy standing. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). The pleaded injury must be both "concrete and particularized" and "actual or imminent" *Lujan v. Def. of Wildlife*, 504 U.S. 555 (1992).

The question of whether a plaintiff has standing to bring suit for violations of the FCRA was addressed by the United States Supreme Court in *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). There, the Court made clear that a plaintiff suing under FCRA "could not … allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.* In other words, while the FCRA grants a person a statutory right to sue to vindicate violations of the statute, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.*

On remand from the Supreme Court, in *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1113 (9th Cir. 2017) (*Spokeo II*), the Ninth Circuit adopted the following analytical framework to determine questions of Article III standing for FCRA claims:

13

> In evaluating [a plaintiff's] claim of harm [under FCRA], we thus ask: (1) whether the statutory provisions at issue were established to protect his concrete interests (as opposed to purely procedural rights), and if so, (2) whether the specific procedural violations alleged in this case actually harm, or present a material risk of harm to, such interests.

### 2. Standing Under the FCRA's Pre-Adverse-Action Notice Provision

Following *Spokeo*, there has been a Circuit split on how plaintiffs can demonstrate standing in pre-adverse-action notice claims under § 1681b(b)(3)(A), with the Eighth and Ninth Circuits on one side and the Third and Seventh Circuits on the other. The distinguishing issue is the question of whether the FCRA confers a right to explain negative but accurate information in a consumer report prior to the employer taking an adverse employment action.

In holding that a concrete injury is created when § 1681b(b)(3)(A) is violated, even in the context of accurately reported negative information, the Third and Seventh Circuits have reasoned that the injury arises from the loss of an opportunity to explain that negative information. As the Third Circuit explained:

> The required pre-adverse-action copy of an individual's consumer report allows him to ensure that the report is true, and may also enable him to advocate for it to be used fairly – such as by explaining why true but negative information is irrelevant to his fitness for the job. The required pre-adverse-action notice of FCRA rights provides the individual with information about what the law requires with regard to consumer reports. The advance notice requirement, then, supports both accuracy and fairness. It helps ensure that reports are properly used and relevant for the purposes for which they are used.

*Long*, 903 F.3d at 319. The Seventh Circuit also endorsed this view, holding that "[p]roviding context may be more valuable than contesting accuracy…[I]nformation that seems damning at first glance might not be so bad in context. A person with a

spotted record might convince an employer to revisit its decision if she can explain what happened." *Robertson*, 902 F.3d at 697.

Taking the opposite view, the Eighth Circuit weighed in on the debate in *Schumacher v. SC Data Center*, Inc., 33 F.4th 504, 511 (8th Cir. 2022). There, the court held that the FCRA's text does not reflect an intention to protect against the loss of opportunity to explain accurate information and declined to read such a protection into the statute, though the *Schumacher* opinion fails to grapple with the textual grounding of the holdings in *Robertson* and *Long*.[1]

Most district court opinions align with the Third and Seventh Circuits' interpretation. There are a few courts that have failed to find standing for plaintiffs who have been denied the opportunity to explain negative but accurate information in a consumer report. *See Boergert v. Kelly Serv., Inc.*, 2016 WL 6693104 (W.D. Mo. Nov. 16, 2016); *Tyus v. U.S. Postal Serv.*, 2016 WL 6108942 (E.D. Wis. Oct. 19, 2016). But many more courts have found standing in these situations. *See Merck v. Walmart Inc.*, No. 2:20-CV-2908, 2022 WL 2012078 (S.D. Ohio June 6, 2022); *Hood v. Action Logistix, LLC*, 528 F. Supp. 3d 1062 (E.D. Mo. Mar. 25, 2021); *Mattiaccio v. DHA Grp., Inc.*, F. Supp. 3d 231 (D.D.C. 2020); *Long v. NUCO Educ. Corp.*, 2020 WL 13469459 (N.D. Ohio Apr. 20, 2020); *Sharp v. Technicolor Videocassette of Mich., Inc.*,

---

[1] The text of § 1681b(b)(3)(A) includes no reference to inaccuracies as a reason for disclosure, unlike the following paragraph, § 1681b(b)(3)(B), which covers positions regulated by the Secretary of Transportation and does explicitly limit the range of disputes to "accuracy or completeness." *Robertson*, 902 F.3d at 695-696. The "right to dispute and correct consumer reports is [also] provided elsewhere" in the FCRA, *see* 15 U.S.C. § 1681i, which implies that § 1681b is "not limited to situations where the report is inaccurate." *Long*, 903 F.3d at 319.

15

No. 2:18-CV-02325-CGC, 2019 WL 167423 (W.D. Tenn. Jan. 10, 2019); *Jones v. Salvation Army*, 2019 WL 6051437 (M.D. Fla. Nov. 15, 2019); *Anderson v. Wells Fargo,* 266 F. Supp. 3d 1175 (D.S.D. July 17, 2017); *Thomas v. FTS USA, LLC*, 193 F. Supp. 3d 623, 638 (E.D. Va. June 30, 2016); *Mix v. Asurion Ins. Serv. Inc.*, 2016 WL 7229140 (D. Ariz. Dec. 14, 2016).

### 3. Standing Under the FCRA in the First Circuit

The First Circuit has not decided the question before the Court, and none of the district courts in the First Circuit that have weighed in on FCRA standing have addressed the issue of pre-adverse-action notice for negative but accurate information. While *Goldberg v. Uber Technologies, Inc.*, 2015 WL 1530875 (D. Mass. 2015) involved an action brought under § 1681b(b)(3)(A), the claim in that case was very different from the one before this Court, because the plaintiff in *Goldberg* had received pre-adverse notice and, as a result, was able to share mitigating information with his employer. In *Goldberg*, Uber sent the plaintiff his background report which disclosed that he faced a pending federal indictment related to marijuana distribution. *Id.* at 1. The day after receiving this report, plaintiff emailed Uber to explain that he had never been convicted of any crimes, a fact that Uber promised to consider in its hiring decision. *Id.* When Uber rejected his application based, in part, on the information in his background report, plaintiff sued on a theory that § 1681b(b)(3)(A) requires employers to advise applicants before running a background check that it might take adverse employment action based on that check. *Id.* at 3. The court dismissed the action for lack of standing, holding that the FCRA "only

requires an employer to provide a copy of the consumer report and a written description of the person's rights under the statute prior to any adverse action." *Id.* (quoting *Reinke v. Cargill, Inc.*, 2011 WL 2471739, at *4 (E.D. Wis. June 21, 2011).

The two other FCRA standing cases in the First Circuit do not address the precise issue before this Court, but both cases point to a broader, rather than a narrower, interpretation of what constitutes an injury-in-fact under the FCRA. In *Kenn v. Eascare, LLC*, 483 F. Supp. 3d 26, 31 (D. Mass. 2020) a plaintiff claimed that she had faced a background check without proper authorization because the disclosure notice attached to the authorization request included a liability waiver. The court held that the alleged notice and disclosure deficiencies did not constitute a sufficiently concrete injury under the FCRA. *Id.* at 34. Although the *Kenn* case was not brought under the pre-adverse-action notice requirement provision of FCRA, but under the FCRA's disclosure and authorization requirements, the court held that procedural violations of the FCRA *can* cause concrete injuries.

> Although a procedural violation of FCRA does not automatically confer standing, a procedural violation may cause injuries that are sufficient. *See Landrum v. Blackbird Enters., LLC*, 214 F. Supp. 3d 566, 570 (S.D. Tex. 2016) ("The failure to provide information in accordance with a statute could constitute a concrete injury.").

*Id.*

*Landry v. Thomson Reuters Corp.*, 2018 WL 4568809 (D. N.H. Sept. 24, 2018) addresses a claim against a consumer report agency for reporting inaccurate information. However, like the court in *Kenn*, the *Landry* court made clear that an alleged procedural violation of the FCRA can be enough to satisfy standing

17

requirements. "[S]ome violations of the FCRA may be so trivial that they cause no quantifiable injury…Other violations of the FCRA, however, may be sufficiently severe that those statutory violations alone constitute a concrete and particularized injury." *Id.* at *4. The court then held that defendant's alleged FCRA violations created exactly the kind of harm that Congress was attempting to prevent when it enacted the FCRA, and therefore, although plaintiff could not demonstrate a concrete harm (*i.e.*, that he was fired as result of the incorrect credit report), the severity of the alleged statutory violation could convey standing. *Id.* at *5.

### 4. Mr. Azeez's Standing to Bring an FCRA Claim

This Court agrees with the majority of courts that have found that § 1681b(b)(3)(A) provides an employee the right to receive a copy of their consumer report and discuss its contents with their employer before an adverse action is taken against them based on that report regardless of whether the information in the report is accurate. As the Seventh Circuit explained, "Providing context may be more valuable than contesting accuracy." *Robertson*, 902 F.3d at 697. Certainly, there was a great deal of context that Mr. Azeez might have provided in this case. He could have discussed how he had rehabilitated himself following his college-era convictions – staying out of trouble since 2016, completing his bachelor's degree in biochemistry, and embarking on other legitimate business ventures. (ECF No. 22 at 3.) Or he could have pointed to his employment with Lifespan over the prior year to argue that his past convictions had created no barriers to performing his responsibilities as a Research Assistant. Thus, when Mr. Azeez was denied his statutorily protected

18

opportunity to receive and respond to the information in his background check, he suffered an injury-in-fact sufficient to demonstrate standing.

## IV.   CONCLUSION

For these reasons, the Court determines that Mr. Azeez has presented a genuine issue of material fact as to whether he was fired for retaliatory or discriminatory purposes.  In addition, the Court finds that Mr. Azeez has adequately alleged that he was deprived of benefits afforded by the FCRA to demonstrate standing.

Accordingly, the Court GRANTS Lifespan's Motion for Summary Judgment (ECF No. 16) on the hostile work environment claims that Mr. Azeez has already conceded but DENIES Lifespan's Motion on all other claims.

IT IS SO ORDERED.

_____
Mary S. McElroy
United States District Judge

October 11, 2022